## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | |
|---|---|
| CATHERINE LEE<br>14823 POTOMAC BRANCH DRIVE<br>WOODBRIDGE, VA 22191,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>MARSH HUBERT IRVING<br>6014 CREST PARK DRIVE<br>RIVERDALE, PRINCE GEORGE'S COUNTY, MD 20737,<br><br>　　　　　　　Defendant. | Civil Action No. 8:21-cv-2693 |

## COMPLAINT

Catherine Lee, by counsel, hereby submits the following complaint against Marsh Hubert Irving.

## PARTIES

1.　　　Plaintiff Catherine Lee ("Plaintiff" or "Cathy") is domiciled in Virginia and resides at 148 Potomac Branch Drive, Woodbridge, VA 22191.

2.　　　Defendant Marsh Hubert Irving ("Defendant" or "Marsh") is domiciled in Maryland and resides at 6014 Crest Park Drive, Riverdale, Prince George's County, MD 20737.

## JURISDICTION

3.　　　This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) as there is complete diversity between the Parties and the amount in controversy exceeds $75,000.00.

1

4.      This Court has personal jurisdiction over Defendant under MD. CODE ANN., CTS. & JUD. PROC. § 6-102(a) and MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b)(5) as the Defendant is domiciled in Maryland, caused the tortious injuries and fraud alleged in this Complaint in the Commonwealth of Virginia, and Defendant currently owns real property located in Maryland.

5.      Venue is proper in this Court under 28 U.S.C. §1391 because Defendant resides in this judicial district.

## FACTS

**The Beginning of the Relationship**

6.      Cathy is a long-time resident of Woodbridge, Virginia.

7.      Cathy initially met Marsh in 2004 or 2005 after he assisted in helping Cathy's sister with her home renovation projects at her sister's Maryland townhome. Cathy understood he was unmarried at that time.

8.      Based on information and belief, Defendant married Karen Irving on or around 2005.

9.      Defendant is an unlicensed general contractor who undertakes general handyman projects.

10.     At all relevant times, Defendant did not wear his wedding band in public and did not present himself to the public as a married man.

11.     On or about April 14, 2020,  Cathy began having issues with her water heater. Defendant offered to repair her water heater and make other minor repairs to Cathy's home in exchange for approximately $1,900.00.

12.     On or about April 15, 2020, Defendant arrived at Cathy's home fixed the water heater and completed other minor repairs.

13.     Grateful for the speedy and efficient work, Cathy sent a text in which she stated Defendant was the G.O.A.T. (i.e., the Greatest of All Time) and sent a kissing face emoji.

14.     At this time, Cathy was unaware that Defendant was married.

15.     Defendant responded by asking her to save her kisses for him, and stating that he would come to get the kisses whenever she was ready to give them to him.

16.     This exchange sparked an affair between Defendant and Cathy. The couple  began their romantic relationship on or around May 5, 2020.

17.     During the beginning of their relationship, Defendant asked Cathy how she was able to pay her bills as her work schedule had been reduced due to the ongoing COVID-19 pandemic.

18.     Cathy shared that she had rolled her IRA into a traditional IRA which gave her access to almost $144,000.00. She further told him she made several reductions in her monthly expenses.

19.     In May 2020, Cathy called Navy Federal Credit Union to obtain information regading a loan for certain home repairs.  She learned that she was able to borrow up to $50,000.00 for these repairs.  Defendant was listening in on her conversation and gained further information about her ability to access monies. At this point, Defendant clearly began targeting Cathy for money.

20.     Over two months after the Parties began an intimate relationship, on or about June 20, 2020, Cathy asked Defendant if he was married and he finally admitted he was.  However, Defendant told her that his wife was on "self-preservation" and stated that how he needed to start thinking about what was best for him, implying he wanted a future with Cathy.

21.    Defendant further said that he wanted to ask Cathy's brother for her hand in marriage, again perpetuating the false idea that he intended to leave his wife for a life with Cathy.

22.    These statements were all made to Cathy to indicate that the relationship was serious and that the Parties had a future together. However, Defendant intended to stay with his wife unbeknownst to Cathy.

**Defendant's Fraud and Misrepresentations to Get Cathy to Buy A New Work Truck**

23.    Shortly after learning that Cathy was able to get a loan for her home renovation projects, Defendant told Cathy that he was unable to drive from Maryland to Virginia to see her due to his work truck breaking down.

24.    Cathy was also unable to make the drive as her personal vehicle was breaking down.

25.    The Parties agreed to buy a new vehicle together to ensure that they would be able to continue seeing each other.

26.    However, Defendant told Cathy that he was unable to get a new car loan as he claimed to have bad credit.

27.    Defendant's claim of bad credit was made shortly after he learned of Cathy's good credit, indicating that he presumably wanted to use her credit to either hide the car loan from his wife or, alternatively, to use Cathy's feelings for him to her detriment and his benefit.

28.    On June 8, 2020, Cathy and Defendant purchased a 2020 Chevy Silverado 2500 LTZ with an extended cab ("the Truck").

29.    The Truck cost $58,000.00. Fifty Thousand dollars ($50,000.00) was paid by check and the balance was split between two of Cathy's credit cards.

30.    Defendant stated that he would pay for half of the Truck's purchase price upon selling two of his other vehicles. Defendant knew at the time he made his statement that it was false and he had no intention of repaying Cathy.

31.    In fact, Defendant did sell the two vehicles and failed to pay Cathy what he owed her for the Truck.

32.    Defendant put Onstar on the Truck and when the Onstar representative called Cathy Defendant's wife, Defendant encouraged her to assume the role of his wife—furthering his representations that he wanted a serious, long-term relationship with Cathy.

33.    The Truck was jointly titled by Cathy and Defendant, with Defendant being the primary owner and Cathy being the co-owner.

34.    As joint owners, Cathy had the ability to use the Truck for her own personal purposes; however, Defendant was the only individual to use the Truck until recently.

**Defendant's Misrepresentations Regarding the "Investment" Property**

35.    Shortly thereafter, Defendant began the process of buying a new property: 3103 Carlisle Avenue, Baltimore MD 21216 ("the Property")—a property that he planned to purchase with his wife and mother-in-law.

36.    However, Defendant continued his pattern of lying to Cathy and on June 21, 2020, told her that he was interested in purchasing a property as an investment with her but that he did not have enough money for the down payment.

37.    At the time he suggested they purchase a property together, Defendant aleady had a specific property in mind, but failed to disclose this to Cathy.

38.    He further knew he intended invest with his wife and her family, and not Cathy, but failed to dislose the same.

39.     Due to Defendant's false statements regarding his interest in the Property and his desire to purchase the property with her as an investment, Cathy loaned Defendant $20,000.00 to assist with the down payment of the property.

40.     With Cathy's loan to Defendant, Defendant, along with his wife and mother-in-law, were able to close on the Property on August 27, 2020.

41.     At the time, Cathy was unaware Defendant intended to purchase the property with his wife and mother- in-law and would have never loaned the funds under these cicumstanes as the Property was clearly not intended to be an investment property as Defendant represented.

42.     In fact, at all times Defendant knew the Property was intended to be a family home for Defendant and his wife.

43.     Several months later, during October 2020, Defendant requested another loan from Cathy so that he could complete repairs on the Property.

44.     Defendant claimed that these additional funds would be used to pay the day laborers renovating the Property as they had formed a union or the equivalent of a union due to nonpayment.

45.     Defendant claimed to have a FHA 203K loan designed for home renovations in the amount of $30,000.00 that would only be distributed to once he finished the home renovation. Accordingly, he asked to borrow $30,000.00 from Cathy, which he promised he would repay when the renovation was done.

46.     Cathy loaned Defendant the additional $30,000.00 in six increments of $5,000.00 on or around October 13, 2020.

47.     Later, Defendant stated that he needed an additional $20,000.00 to finish the projects on the investment property but then quickly increased the amount to $50,000.00.

48.     Cathy applied for and received a $50,000.00 loan from Navy Federal Credit Union by using the Truck as collateral.

49.     Navy Federal Credit Union currently holds the title to the Truck.

50.     On or around November 2020, Defendant also requested that Cathy help him procure a new, different work truck (the "Second Truck").

51.     Cathy told Defendant that she would loan him $18,000.00 for the Second Truck, but that he would have to remove his name from the first Truck's title and leave only her name on the title.

52.     Defendant agreed.

53.     Consequently, Cathy wrote a check for $18,000.00 directly to the dealership on November 17, 2020.

54.     After Cathy submitted the check to the dealership, Defendant promptly asked the dealership to put the truck solely in his name without any reference to Cathy—a request that the dealership granted.

55.     Consequently, even though Cathy paid $18,000.00 towards the Second Truck, she is not on the title.  Defendant has further refused remove his name from the First Truck's title.

**Defendant's Unravelling Deceit**

56.     Upon information and belief, Defendant was diagnosed with COVID-19 in December 2020.

57.     On or around December 12, 2020, Cathy brought her car to a gas station attached to a garage where one of Defendant's friends worked as a mechanic.

58.     Defendant's brother-in-law was also at this gas station at the time and overheard Cathy mention Defendant's name.

59.     Defendant later visited that gas and while he was there, his brother-in-law allegedly got Defendant in trouble due to Cathy mentioning his name when she dropped off the car.

60.     The incident lead to a contentious text message exchange between the Parties on or around December 16, 2020.

61.     Defendant concluded that whatever happened between them, they should remain civil and cordial. He further acknowledged that he owed Cathy money.

62.     Defendant promised to repay Cathy the money he owed her out of the proceeds of the home where he currently resides in Riverdale, MD ("the Riverdale Property").

63.     Under information and belief, Defendant is now in the process of selling that home.

64.     Defendant specifically stated that he was trying to get things together so Cathy would not have to pay his loan. He further stated "I want to make sure you get back the money you gave me" conceding the funds were loans that needed to be repaid.

65.     The Defendant borrowed $176,000.00 from Cathy, excluding the interest that Cathy still pays on the bank loans she took out to loan him money.

66.     Defendant has made no efforts to repay any of the loans Cathy provided.

67.     Despite repeated demands, Defendant has refused to repay the money to and stated that he did not want to talk to her about it anymore.


## COUNT I
## FRAUDULENT INDUCEMENT

68.     Plaintiff incorporates by reference the facts outlined in paragraphs 1-67 of the Complaint as if outlined in full.

69.     Plaintiff entered into a romantic relationship with Defendant beginning in early 2020.

70.     During the course of their relationship, Plaintiff loaned Defendant a total of $176,000.00 over the course of ten months to assist him in a variety of endeavors.

71.     At all times Plaintiff expected to be repaid.

72.     Due to Defendant's misrepresentations, Plaintiff believed that these endeavors would be mutually beneficial where they were, in fact, solely for Defendant's benefit.

73.     Specifically, Defendant mispresented the nature of the Property as an investment property with Plaintiff when in actuality Defendant purchased the property as an investment property with his wife and mother-in-law.

74.     Defendant intentionally hid this information from Plaintiff.

75.     To date Plaintiff has not received any rental income from the Property.

76.     Plaintiff further loaned Defenant funds purportedly to help with renovation costs on the Property.  Plaintiff believed in good faith that the Propety was a joint endeavor and that any improvements made to the Property would benefit her too.

77.     Plaintiff has not been repaid nor received any of the benefits she is owed from this alleged investment property.

78.     Furthermore, Plaintiff loaned  Defendant $76,000.00 total to assist Defendant in purchasing both a personal vehicle and a work vehicle.

79.     Regarding the personal vehicle, the Truck, Plaintiff assumed that this vehicle would assist Defendant in driving to a mutually agreeable location for them to meet.

80.     Furthermore, Defendant ensured that Plaintiff was not on the title for the work vehicle, the Second Truck, even though she paid $18,000.00 towards the Second Truck's purchase.

81.     If Plaintiff had known that Defendant would remove her from the title of his work truck despite their oral agreement to the contrary or that Defendant would refuse to pay back any of the money that Plaintiff loaned to him so that he could have reliable transportation, then Plaintiff would have not provided those funds to Defendant.

82.     Because Defendant did not disclose his intentions regarding the loaned monies (i.e., he lied about why he needed the money, what he intended to do with the money, and that he intended on repaying Plaintiff), Plaintiff loaned Defendant money as she had better credit and more access to funds than Defendant did.

83.     Defendant's intentional and fraudulent concealment of these material facts was reasonably calculated to deceive Plaintiff into believing that he was romantically attracted to Plaintiff and would use the funds to their mutual benefit.

84.     Plaintiff was deceived by Defendant's actions and statements of affection.

85.     As a direct and proximate result of Defendant's intentional and fraudulent actions, Plaintiff has now lost a total of $176,000.00 plus accruing interest.

## COUNT II
## BREACH OF ORAL AGREEMENT

86.     Plaintiff incorporates by reference the facts outlined in paragraphs 1-85 of the Complaint as if outlined in full.

87.     As Defendant indicated both at the time of contracting and later on in his text messages to Plaintiff, Defendant expressly stated and led Plaintiff to believe that the monies Plaintiff loaned to him would be repaid.

88.     Plaintiff and Defendant agreed in numerous conversations that Plaintiff would loan Defendant money for the down payment on an investment property, for improvements on

that property, and multiple vehicles as her credit and access to liquid assets was better than Defendant's.

89.     Plaintiff and Defendant mutually agreed that Plaintiff would provide loans to Defendant and that Defendant would timely repay these loans.

90.     At no time did Plaintiff intend that these loans be construed as gifts.

91.     Furthermore, Plaintiff and Defendant agreed that the loans Plaintiff provided to Defendant would be used for specific purposes.

92.     Defendant breached these oral contracts by not using the money for the purposes that the Parties agreed upon and by not repaying the funds.

93.     Instead of using the $20,000.00 loan for a down payment on an investment property, Defendant used the money for a down payment for a property he purchased with his wife and mother-in-law.

94.     Instead of using various loan monies to pay for day laborers for the "investment property" as Plaintiff agreed that they would be used for, Defendant used the monies either on his residence or, upon information and belief, to pay two mortgages—neither of which was the purpose for which the parties would agree the money would be used.

95.     Further, Defendant promised to use the monies he received from the sale of the Riverdale Property to repay the loans.

96.     Instead of keeping Plaintiff on the title of the Second Truck as she expressly stated was a condition of her loaning him $18,000.00 and paying it directly to the dealership, Defendant took additional measures to not only keep himself on the vehicle title but to remove Plaintiff entirely.

97.     As a result of Defendant's breach of his oral contracts with Plaintiff, Plaintiff has suffered monetary damages amounting to no less than $176,000.00.

## COUNT III
## UNJUST ENRICHMENT

98.     Plaintiff incorporates by reference the facts outlined in paragraphs 1-97 of the Complaint as if outlined in full.

99.     Due to Plaintiff's good credit, ability to apply for and get loans from banks or other financial institutions, and access to liquid capital, Plaintiff was in a position to provide personal loans to Defendant.

100.     Defendant knowingly sought out and accepted the benefits from Plaintiff's loans.

101.     Defendant did so due to his poor credit and, under information and belief, a desire to hide additional loans from his wife as well as attempt to remove himself from the liability associated with repaying any financial institution regarding said loans.

102.     Defendant has failed to make any efforts to repay Plaintiff for any of the loans that she provided to him despite her requests that he repay her.

103.     The benefits associated with Defendant's receipt of these monetary loans are such that would constitute an unwarranted windfall and would unjustly enrich Defendant to Plaintiff's detriment.

104.     Equity demands that Defendant fully compensates Plaintiff Cathy Lee for her efforts in securing and providing monetary loans to Defendant per the Parties' intentions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and award the following relief:

(a)     A finding of Fraudulent Inducement as detailed in Count I;

(b)     A finding of Breach of Oral Agreement as detailed in Count II;

(c)     A finding of Unjust Enrichment as detailed in Count III;

(d)     An award of compensatory damages of $176,000.00;

(e)     An award of compensatory damages an amount to be determed at trial regarding the monetary interest that Plaintiff has paid towards various financial institutions for the loans she took out for Defendant's benefit;

(f)     An award of punitive damages in an amount to be determined at trial; and

(g)     Any further and just relief the Court deems proper.


Dated: October 19, 2021              Respectfully submitted,

                                     MARCUSBONSIB, LLC


                                     /s/ Joseph A. Compofelice, Jr.
                                     JOSEPH A. COMPOFELICE, JR., ESQ.
                                     Bar No. 26718
                                     6411 Ivy Lane, Suite 116
                                     Greenbelt, Maryland 20770
                                     (301) 441-3000
                                     (301) 441-3003 (fax)
                                     compofelice@marcusbosib.com
                                     *Counsel for Plaintiff*


**JURY TRIAL DEMANDED**

Plaintiff hereby demand a jury by trial on a claims asserted in the Complaint so triable.

                                     /s/ Joseph A. Compofelice, Jr.
                                     JOSEPH A. COMPOFELICE, JR., ESQ.